Rockingham
No. 5952a

DOROTHY LABONTE v. NATIONAL GYPSUM COMPANY

December 28, 1973

*Shaines, Madrigan & McEachern (Mr. Duncan A. McEachern* orally) for the plaintiff.

*Calderwood & Ouellette* and *Dennis L. Hallisey (Mr. Hallisey* orally) for the defendant.

GRIMES, J. This is an action to recover for loss of consortium (*LaBonte v. Nat'l Gypsum Co.,* 110 N.H. 314, 269 A.2d 634 (1970)) arising out of an injury to plaintiff's husband, William, when he was intentionally struck by a fellow employee while in the employ of the defendant. Both plaintiff and her husband also sued Spinney, the fellow employee, and the three cases were tried together by jury, resulting in verdicts for plaintiff in the amount of $20,000 against both defendants and for her husband in the amount of $45,000 against Spinney. The questions of law raised by defendant company's exceptions, which include the sufficiency of the evidence, the fairness of the trial and the excessiveness of the verdict, were transferred by *Morris,* J.

William LaBonte was employed by the defendant as a janitor from 1963 to 1966 when there was a general lay-off. He was rehired in June of 1966 to load trucks, and after a few months, "bid" on a job as dust collector and obtained it. There are three shifts, each having four men, in this particular mill. One of the other jobs on each shift was that of Raymond Mill operator. Men working on different shifts

had very little contact with one another. At some time William became acquainted with John Spinney, who was then a Raymond Mill operator. Friction developed between them.

The jury could find the following facts: In March of 1967, LaBonte bid on and obtained a job as Raymond Mill operator. He did this because of higher pay and also because if he had the same job as Spinney he would never have to work on the same shift with him as they would be doing the same job. Spinney, however, bid on the dust collector job left vacant by LaBonte and after obtaining it, was transferred somehow to the same shift as LaBonte. After thirty days, during which Spinney harassed him, LaBonte's request for his old job back on a different shift was granted. Spinney then obtained the Raymond Mill job vacated by LaBonte and, the two men worked on different shifts for more than a year until June 13, 1968. On that day, Spinney with permission of Buzzell's foreman substituted for Buzzell, the Raymond Mill man on LaBonte's shift, so Buzzell could attend his daughter's graduation. This put Spinney and LaBonte on the same shift. At supper time, LaBonte went into Mr. Thomas' office to eat as he had previously been given permission to do to avoid Spinney, but Spinney came to the door and made "cow calls". After finishing his supper, LaBonte went to discard his rubbish and Spinney appeared behind him and struck him on the side of the neck, causing him to fall down over a saw used to cut steel. The resulting injury was the basis of Mrs. LaBonte's claim for loss of consortium.

There was evidence that it was generally known that there was friction between the two men. Thomas, the Mill superintendent, knew of it, warned LaBonte that Spinney was after him and to be careful, and at one time unsuccessfully tried to get them to "bury the hatchet". Coventry, the plant manager, knew of it and allowed LaBonte to go back to his old job to get on a different shift than Spinney. He testified that he gave oral orders to Thomas to keep them on different shifts to the "extent of his ability" but no written orders were given. Thomas denied he received any orders.

Evidence of Spinney's antagonism included evidence that he kicked LaBonte in the leg when they were in the locker room, shoveled stucco on him from the floor above during

the previous period they were on the same shift, and that during the same period, LaBonte's machine stopped on several occasions, which he attributed to Spinney.

It is on this evidence that plaintiff claims that defendant breached its duty which was stated in the charge to the jury to be "to use reasonable care to furnish a reasonably safe place" for William to work. The evidence supports the finding of liability against the defendant. The jury could find that no order to keep the men separated was given although the defendant through its agents should have anticipated injury to LaBonte at the hands of Spinney if they were on the same shift. The defendant was findably negligent in retaining Spinney or in not establishing, giving notice of, and enforcing a rule that the two men not be allowed to work on the same shift. Restatement (Second) of Agency §213 (1958); *Tatum v. Wabash R. Co.*, 412 Ill. 568, 107 N.E.2d 735 (1952).

Defendant contends that it did not receive a fair trial because of the introduction of evidence of the bodily injury to William since Dorothy was entitled to recover only for the damage done to her through loss of consortium. The two actions for loss of consortium were tried together with William's action against Spinney. The evidence of bodily injury to William was clearly admissible in the latter action.

The nature and extent of William's injuries were also relevant on the issue of loss of consortium. The trial court instructed the jury that the evidence of lost wages was no part of Dorothy's case and that "Dorothy LaBonte is not entitled to recover any of the elements of damage that William LaBonte is entitled to receive". He also clearly explained what elements of damage are included in loss of consortium, emphasized the fact that hers was a separate action and instructed the jury that if they gave a verdict to Dorothy, they "would not include in that the personal injury claim of William LaBonte .... "

Defendant claims that the trial court failed to instruct the jury that they could return a verdict against Spinney without returning one against this defendant. Although not stated in those precise terms, the court did make it clear that if they found Spinney liable by finding he hit William, they had one more task in Dorothy's action against this defendant

and that a finding that "the striking took place . . . does not mean in and of itself that Dorothy LaBonte is entitled to recover from National Gypsum Company". The court then explained that before a verdict could be returned against this defendant, Dorothy would have to prove that the defendant violated its duty to "use reasonable care to furnish a reasonably safe place". He instructed them that if they found that the defendant used due care, they should "bring in a verdict for National Gypsum". Taken as a whole, the charge made it clear that a defendant's verdict could be returned for the company while returning a plaintiff's verdict against Spinney.

During defendant's argument, the jury was told not to speculate on why there was no action by William against this defendant. Plaintiff's counsel in his argument referred to this and then stated that the law does not "allow Mr. LaBonte to sue his employer". On objection, the court instructed the jury to disregard it and that they were to decide the cases they had before them. Defendant argues that it was prejudiced because the jury, knowing that William could not sue his employer, would seek to compensate him by increasing the verdict to Dorothy. This was one of the claims made in defendant's motion to set aside the verdict. The denial of this motion by the trial court constituted a finding that the trial was fair and we see no reason to disturb it.

Defendant claims that the verdict of $20,000 is excessive. This issue was presented to the trial court by defendant's motion for a remittitur which was denied. The issue was one of fact for the trial court, the determination of which will not be interfered with unless the verdict is manifestly exorbitant. *Jackson v. Leu-Pierre,* 112 N.H. 406, 296 A.2d 902 (1972). The damages for loss of consortium cannot be determined with mathematical certainty. They include such elements of subjective value as loss of "love, companionship, affection, society, sexual relations, services, solace". *LaBonte v. National Gypsum Co.,* 110 N.H. 314, 318, 269 A.2d 634, 637 (1970).

As a result of the assault, William suffered a nerve injury to his shoulder and arm from which he was still having pain and receiving treatment at the time of trial in April 1972.

He was out of work from the time of the assault in June 1968 to January 1972 and cannot do anything but light work. According to plaintiff's testimony, she had to nurse him and up to the time of trial had had to rub his shoulder each night after a hot shower, and she now has to mow the lawn and shovel snow and do other things that he used to do around the home. She also testified that her whole life has changed, their sexual relationship which had been satisfactory was terminated, their social life has been all but eliminated, they "bicker a lot more," and he is irritable which makes her nervous and he is so restless at night as to interfere with her rest so that for a year they had to sleep in separate beds but even then her sleep was disturbed.

We cannot say that the verdict was manifestly exorbitant or excessive. *Jackson v. Leu-Pierre*, 112 N.H. 406, 296 A.2d 902 (1972).

*Exceptions overruled; judgment on the verdict.*

All concurred.